**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MARVIN JONES** | § | |
| | § | |
| **v.** | § | **NO.  A-06-CA-091 AWA** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION** | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court are: Plaintiff's Brief in Opposition to the Commissioner's Decision (Clerk's Doc. No. 14);  Defendant's Brief in Support of the Commissioner's Decision (Clerk's Doc. No. 17); Plaintiff's Reply Brief and Motion for Oral Arguments (Clerk's Doc. No. 24); Defendant's Reply Brief (Clerk's Doc. No. 25); and the Social Security Record filed in this case (Cited as "Tr.").[1]

## I.  GENERAL BACKGROUND

Plaintiff Marvin Jones ("Plaintiff") originally applied for Disability Insurance Benefits and Supplemental Security income under Title II and Title XVI of the Social Security Act ("Act") on November 18, 1990, at the age of 28, alleging that he was disabled due to sickle cell anemia. Tr. 83-90.   Plaintiff alleged that he was diagnosed with sickle cell anemia as a child and although he had worked at numerous jobs in the past (such as a container assembler, dishwasher, grocery store stocker, warehouseman, and bus driver), he alleged that he was no longer able to work full-time due to severe incapacitating episodes of pain from the disease. Tr. 158.  Plaintiff stated that he would experience severe sickle cell flare-ups three times a month during which he would experience severe

---

[1]Plaintiff has had three hearings before an ALJ in this case and there are 1343 pages of medical and administrative records before this Court.  Accordingly, the Court finds that an oral hearing in this case is unnecessary and therefore **DENIES** Plaintiff's Motion for an Oral Hearing (Clerk's Docket No. 19).

joint pain and had difficulty walking and used a cane.  Although Plaintiff stated that he had been

prescribed medication for the pain, Plaintiff admitted that he did not take the medication because he

could not afford it.  *Id.*  After considering Plaintiff's subjective complaints of pain and description

of his sickle cell anemia, an Administrative Law Judge ("ALJ"), on November 20, 1991, found that

Plaintiff had a severe impairment of sickle cell anemia and a musculoskeletal impairment (allegedly

suffered in a car accident) which precluded his ability to perform a full range of sedentary work.  Tr.

160-61.  Accordingly, the ALJ determined that Plaintiff was disabled within the meaning of the Act

and awarded Plaintiff monthly disability benefits beginning in January 1992.  Tr. 161.

After conducting a Continuing Disability Review of Plaintiff's disability, completed on

January 17, 1995, the Commissioner concluded that Plaintiff was no longer disabled due to medical

improvement in his condition.  Tr. 180-84.  After reviewing Plaintiff's most recent medical records,

the Commissioner determined that Plaintiff's "current symptoms are not severe enough to be

considered disabling under Social Security guidelines." Tr. 184.  Although the Commissioner found

that Plaintiff did have a severe impairment which precluded him from performing his past relevant

work, she determined that Plaintiff's condition would permit him to perform less demanding work.

*Id.*  Plaintiff subsequently filed a Request for Reconsideration of the Disability Cessation.  Tr. 185.

However, the Disability Hearing Officer affirmed the cessation of Plaintiff's benefits on June 13,

1995, concluding that there has been a medical improvement in Plaintiff's impairment and that

Plaintiff "does not have a severe physical or mental impairment" which would interfere with his

ability to work. Tr. 190-194.  Specifically, the Disability Hearing Officer found that Plaintiff had not

had a sickle cell flare-up in over two years, and noted the medical records show that Plaintiff's

physical examinations and x-rays were all normal.  Tr. 195.  She further noted that although the

medical records showed that Plaintiff went to the emergency room for a variety of complaints including sprained ankles, chest pain, urinary tract infection and body aches, "there is no documentation in file that supports treatment for sickle cell" or for that matter a concrete medical diagnosis of the disease. Tr. 193. The Hearing Officer also noted that the medical records show that Plaintiff has had a history of drug abuse. *Id.* Based on the medical records and Plaintiff's allegations, the Hearing Officer concluded that Plaintiff did not have a severe mental or physical impairment which would preclude him from working. Plaintiff appealed the Hearing Officer's decision and requested a hearing before an ALJ, which was held on August 19, 1997. On November 20, 1997, the ALJ issued an opinion affirming the Hearing Officer's decision finding that Plaintiff was no longer disabled. Tr. 425-427. The ALJ found that although Plaintiff had a history of complaining of sickle cell anemia, he found that there was no medical evidence in the record to substantiate a diagnosis of sickle cell disease. Tr. 425. The ALJ noted that Plaintiff's physical examinations were all normal and that Plaintiff's testimony regarding his symptoms was not credible in light of the medical records. Tr. 426. Plaintiff did not appeal the ALJ's decision to cease his disability benefits and therefore the decision became the final decision of the Commissioner.

On January 27, 1998, Plaintiff filed a new Application for Disability Insurance Benefits and Supplemental Security Income, again claiming that he was unable to work (this time since April 1, 1995) due to sickle cell anemia. Tr. 461-63 ("Second Application"). The Commissioner denied this Second Application for benefits initially and upon reconsideration, finding that Plaintiff's condition was not disabling. Tr. 432-440, 444-448. Plaintiff appealed this decision and requested another hearing before an ALJ, which was held on January 18, 2000. Tr. 48. On May 22, 2000, after considering the medical evidence, the hearing testimony and Plaintiff's own complaints of pain, the

ALJ found that Plaintiff had severe impairments of sickle cell anemia and depression, but that such impairments were not disabling. Opinion at 6, Tr. 53.  The ALJ noted that despite Plaintiff's subjective complaints of disabling pain, Plaintiff testified that he can lift up to forty pounds occasionally, plays basketball, jogs, can cook, make his bed, bring groceries into the house, attends church twice a month, and visits friends twice a week. Opinion at 4, Tr. 51.  Although the ALJ acknowledged that Plaintiff had a history for treatment of sickle cell anemia, he found that the majority of the medical records showed that Plaintiff was not within any acute distress and that physical examinations proved to be normal.  *Id.*  The ALJ further noted that Plaintiff's only admission for inpatient care during the relevant time period was for complaints of visual hallucinations which Plaintiff experienced after using cocaine.  *Id.*  Although the ALJ found that Plaintiff had severe impairments of sickle cell anemia and major depression, he found that such impairments did not prevent him performing his past relevant work and therefore found that he was not disabled.  Opinion at 6, Tr.53.  On December 13, 2001, the Appeals Council affirmed the ALJ's decision. Tr. 41.

Plaintiff filed his Third Application (the instant Application on review) for disability benefits for Disability Insurance Benefits and Supplemental Security Income on July 2, 2002, alleging an inability to work since April 1, 1995, due to sickle cell anemia, nerve damage to his hand and mental problems.  Tr. 868.  The Commissioner denied this Third Application for benefits initially and upon reconsideration finding that Plaintiff's condition was not disabling. Tr. 790-91.  Plaintiff requested a hearing before an ALJ, which was held on March 25, 2004.  Tr. 21. The ALJ found that Plaintiff had severe impairments of sickle cell anemia, mental problems and nerve damage to his hand, but that none of Plaintiff's impairments would prevent him from performing a limited range of medium

4

work. Tr. 35-36.  Plaintiff appealed the ALJ's decision which was affirmed by the Appeals Council

on December 9, 2005.  On February 8, 2006,  Plaintiff brought the instant action pursuant to 42

U.S.C. § 405(g) for judicial review of the final decision of the Commissioner.

## II. THE HEARING BEFORE THE ALJ

As noted, Plaintiff's Third Application for benefits alleges that  he has been unable to engage

in substantial work activity since April 1, 1995, due to sickle cell anemia, nerve damage to his hand

and mental problems.  On March 25, 2004, Administrative Law Judge Adolfo J. Vila, III ("ALJ"),

held a hearing on the Applications for Benefits.  Tr. 1288-1325.  Plaintiff was represented at the

hearing by his attorney, Bob Richardson.  Plaintiff was 41 years-old at the time of the hearing before

the ALJ.  Plaintiff, his mother Jill Jones, and his sister Yvonne Mitchell, all testified on behalf of the

Plaintiff at the hearing.  In addition, a medical expert, Dr. Antoinette R. Cicerelio, M..D., and a

vocational expert, Thomas Irons, Ph.D., also testified at the hearing.

## A.      Plaintiff's and Family Member's Testimony

Although Plaintiff has been married at least twice, Plaintiff testified that he is currently single

and lives with his mother and sister.  Although it is not entirely clear, it appears that Plaintiff has

three children who he does not see on a regular basis.  Plaintiff testified that he attended special

education classes in school and  dropped out of high school in the Tenth grade.  Plaintiff testified

that he was last employed as a school bus driver for the Waco Independent School District.  Plaintiff

stated that he was fired in 1991 because he had to be hospitalized for a sickle cell flare-up.  In 1999,

Plaintiff spent six months in jail for violating his probation for the crimes of theft and assault.  While

in jail, Plaintiff was assigned to the kitchen for various work duties.  Plaintiff testified that he is not

a malingerer and that he has not faked any of his mental problems.

5

Plaintiff's mother, Jill Jones, and his sister, Yvonne Mitchell also testified at the hearing. Plaintiff's mother testified that Plaintiff lives with her and testified that Plaintiff has difficulty sleeping and spends his days walking and prancing around the house. She further testified that Plaintiff has a bad temper and does not have any social life. Plaintiff's sister also testified that Plaintiff has a bad temper and has trouble sleeping. She further stated that Plaintiff has a terrible memory and has had recurring mental problems.

**B.   Medical Expert's Testimony**

Dr. Antoinette R. Cicerelio, M.D., testified as a medical expert ("M.E.") at the hearing. The M.E. testified that there were no medically determinable mental impairments noted in Plaintiff's medical records from 1997 to the date of the hearing other than malingering and a personality disorder "not otherwise specified." Tr. 1290. The M.E. defined "malingering" to mean "a gross exaggeration or feigning of an illness of some sort, in this case a mental illness, for secondary gains." Tr. 1293. The M.E. opined that certain diagnoses and test scores in the records were invalid due to Plaintiff's malingering. The M.E. testified that based upon Plaintiff's medical records, she did not believe that Plaintiff had any psychological limitations whatsoever.

**C.   Vocational Expert's Testimony**

Thomas Irons, Ph.D., testified as a vocational expert ("V.E.") in the case. The V.E. testified that Plaintiff's past relevant work included working as a bus driver for a school district and working as a kitchen helper while he was in prison. The V.E. testified that Plaintiff's job as a bus driver would be considered medium, semi-skilled work, while the kitchen helper job would be classified as medium, unskilled work.

6

### III.  FINDINGS OF ADMINISTRATIVE LAW JUDGE

After review of the medical evidence, consideration of Plaintiff's testimony, the medical expert's testimony, the vocational expert's testimony as well as consideration of Plaintiff's alleged disabling impairments, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act.  The ALJ found that Plaintiff had severe impairments of sickle cell anemia, mental problems and nerve damage to his hand, but found that such impairments did not meet the Listing of Impairments.  Tr. 35.

While the ALJ acknowledged that Plaintiff has had a history of sickle cell anemia, he pointed out that the medical records did not support the severity of Plaintiff's subjective symptoms of pain and discomfort.  The ALJ noted that numerous findings in the record showed that Plaintiff's physical examinations were normal and that Plaintiff was not in acute distress.  The ALJ also noted that the record indicates that Plaintiff has a drug and/or alcohol problem. Tr. 28  The ALJ found that Plaintiff's allegations regarding his limitations were not entirely credible and that Plaintiff was faking the severity of his symptoms in an attempt to avoid work and receive benefits, *i.e.*, that he was guilty of malingering.  The ALJ also found that Plaintiff's activities of daily living were inconsistent with his allegations of total disability. Tr. 29.

Regarding Plaintiff's alleged mental problems, the ALJ concluded that Plaintiff had a severe mental impairment which "resulted in moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate deficiencies in concentration, persistence, and pace." Tr. 26.  However, based upon the medical evidence and the medical expert's testimony, the ALJ concluded that Plaintiff's mental impairment did not meet Listing 12.00.  The ALJ noted

that numerous physicians had found that Plaintiff was grossly exaggerating his mental impairments in order to avoid work and get awarded benefits.

The ALJ opined that Plaintiff had the residual functional capacity to perform a wide range of medium work activities that do not require lifting and/or carrying more than fifty pounds occasionally and twenty-five pounds frequently.  Although the ALJ found that Plaintiff could not perform his past relevant work, he found that Plaintiff could perform a significant number of medium-level jobs in the national economy and thus concluded that Plaintiff was not under a disability as defined in the Social Security Act.  Tr. 36**.**

## IV.  ISSUES BEFORE THE COURT

Plaintiff contends that the ALJ's decision is not supported by substantial evidence and is not based upon the proper legal standards.  Plaintiff first argues that the ALJ erred at Step Three of his analysis by failing to find that Plaintiff met the requirements for mental retardation as set out in §12.05 of the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  Next, Plaintiff argues that he did not receive a "full and fair" hearing before the ALJ.

## V.  STANDARD OF REVIEW

In Social Security disability appeals, the limited role of the reviewing court is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether the Commissioner applied the proper legal standard.  *Kinash v. Callahan*, 129 F.3d 736, 738 (5th Cir. 1997); *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*,

8

707 F.2d 162, 164 (5ᵗʰ Cir. 1983)).  Courts weigh four elements of proof when determining whether

there is substantial evidence of a disability: (1) objective medical facts; (2) diagnoses and opinions

of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability;

and (4) her age, education, and work history.  *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995).

However, the  reviewing court cannot re-weigh the evidence, but may only scrutinize the record to

determine whether it contains substantial evidence to support the Commissioner's decision.  *Leggett*

*v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  "The Commissioner, rather than the courts, must

resolve conflicts in the evidence."  *Martinez*, 64 F.3d at 174.  If supported by substantial evidence,

the Commissioner's findings are conclusive and are to be affirmed.  *Crowley v. Apfel*, 197 F.3d 194,

197 (5th Cir. 1999).

## VI.  ANALYSIS

The Social Security Act defines "disability" as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is

disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R.

§ 404.1520 (1999).  First, the claimant must not be presently working at any substantial gainful

activity.[2]  Second, the claimant  must have an impairment of combination of impairments that is

severe.  An impairment or combination of impairments is "severe" if it "significantly limits [a

claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  Third,

---

[2] Substantial gainful activity is work activity that is both substantial and gainful.  Substantial
work activity is work activity that involves doing significant physical or mental activities.  Gainful
work activity is work activity that an individual performs for pay or profit. 20 C.F.R. 416.972.

the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations.  Fourth, the impairment must prevent the claimant from returning to her past relevant work.  Fifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520.

At steps one through four, the burden of proof rests upon the claimant to show she is disabled. *Crowley*, 197 F.3d at 198.  If the claimant acquits her responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment that claimant is capable of performing in spite of her existing impairments. *Id.*  If the Commissioner meets this burden, the claimant must then prove she in fact cannot perform the alternate work. *Id.*

## A.     Listing 12.05

Plaintiff argues that the ALJ erred at Step Three of his analysis by failing to find that Plaintiff met the requirements for mental retardation as set out in §12.05 of the Listing of Impairments.  To "meet" a Listing in Step Three, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement. See 20 C.F.R. §§ 404.1525(a)-(d), 416.925(a)-(d). To "equal" a Listing in Step 3, the medical findings must be "at least equal in severity and duration to the listed findings." See id. §§ 404.1526(a), 416.926(a).  The claimant has the burden of proving that an impairment meets or equals a listed impairment. *See Sullivan v. Sebley*, 493 U.S. 521, 530-31 (1990).

### 1.     The ALJ's Findings

A review of the ALJ's opinion reveals that he did not include a discussion of Listing 12.05 in his analysis.  The ALJ failed to discuss Listing 12.05 because Plaintiff did not allege that he was

disabled due to mental retardation either his Application for benefits or during his hearing before the ALJ.  While Plaintiff alleged in his most recent Application for benefits that he is disabled because of sickle cell disease, nerve damage in his hand, and *mental problems*, Plaintiff did not mention mental retardation.  Tr. 21, 874.  In fact, none of Plaintiff's prior Applications for benefits, requests for reconsideration, or various appeals of the Commissioner's decisions, have ever mentioned that Plaintiff is disabled because of mental retardation.  See Tr. 43, 71, 76, 79, 83.  Instead, Plaintiff's various Applications for Social Security Benefits have primarily focused on his diagnosis of sickle cell anemia.  *Id.*  In fact, Plaintiff's First and Second Applications for benefits, filed on December 19, 1990 and February 18,1998, only alleged sickle cell anemia, *not* mental problems, as an alleged disabling condition.  Tr. 425, 485.  Thus, it is no surprise that the ALJ's decision did not specifically address Listing § 12.05 in his analysis.  *See Clay v. Barnhart*, 417 F.3d 922, 929 (8th Cir. 2005) ("The absence of a record of treatment, diagnosis, or even inquiry into a mental impairment prior to applying for benefits weighs against finding there to be an impairment").  However, because Plaintiff's attorney did raise the issue of Listing 12.05 in her letter to the Appeals Council appealing the ALJ's decision in this case,[3] the Court will consider this claim in the instant case.

Although the ALJ did not specifically address Listing 12.05 or the issue of Plaintiff's alleged mental retardation in his analysis, the ALJ did address Listing 12.00 "Mental Disorders,"[4] the introductory regulation applicable to *all* listed mental disorders.  The ALJ found that Plaintiff had a severe mental impairment which "resulted in moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate deficiencies in concentration,

---

[3]*See* Tr. at 1228.

[4]20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.

11

persistence, and pace." Tr. 26.  However, based upon the medical evidence and the medical expert's testimony, the ALJ concluded that Plaintiff's mental impairment did not meet Listing 12.00. Specifically, he found that "the medical evidence does not reflect all of the findings specified in the Listing or Impairments nor do the clinical findings, x-rays, or laboratory test show the severity contemplated in 20 C.F.R., Part 404, Appendix 1, Subpart P." *Id.*  The ALJ found that the medical evidence in the record did not support a finding that Plaintiff had a disabling mental impairment. The ALJ noted that numerous physicians had found that Plaintiff was guilty of malingering.  Tr. 29-30.  In addition, the ALJ found that Plaintiff's low test results were invalid and unreliable due to Plaintiff's repeated malingering.

  **2.**  **Has Plaintiff met Listing 12.05?**

   To meet Listing 12.05 for mental retardation, an individual (1) must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22" *and* (2) must satisfy the criteria listed in Subsection A, B, C, or D.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.  Plaintiff claims that he has met the criteria listed in both Subsections 12.05(B) and 12.05(C).  Subsection 12.05(B) states that the required level of severity for mental retardation is met when the claimant has a "valid verbal, performance, or full scale IQ of 59 or less." *Id.* at §12.05(B).  Subsection 12.05(C) states that the required level of severity for mental retardation is met when the claimant has produced a  "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* at § 12.05(C).

Plaintiff argues that he has met Subsection B of Listing § 12.05 since he was assessed two full scale IQ scores below 60. While Plaintiff is correct that he was assessed such IQ scores, Plaintiff fails to acknowledge that there are repeated notations in the medical records that Plaintiff grossly exaggerated or faked symptoms, randomly responded to test questions, and was guilty of malingering. Based upon these diagnoses, the ALJ found that Plaintiff's low IQ scores were not reliable or valid. As revealed below, the Court finds that the substantial evidence in the record supports the ALJ's finding on this matter.

Plaintiff relies heavily on a psychological examination performed by Dr. M. David Rudd, Ph.D, ABPP, a psychologist, on November 2, 2002. Dr. Rudd opined that Plaintiff had a full scale IQ of 51, which is categorized in the bottom 1% in comparison to his peers and thus in the deficient classification. Tr. 1033. Dr. Rudd found that the Plaintiff's IQ test scores "indicate uniform impairment and are consistent with substantial impairment potentially secondary to a head injury,[5] as well as psychosis." *Id.* Dr. Rudd further found that Plaintiff's test scores on the Wide Range Achievement Test-3 ("WRAT-3") (which were at the level of a kindergartner) were consistent with Plaintiff's low IQ and opined that Plaintiff "cannot read, write, or complete arithmetic tasks with any degree of effectiveness." Tr. 1034. Dr. Rudd also noted that Plaintiff scored extremely low on the Wechsler Memory Scale III and Bender Visual Motor Gestalt Tests, and found that Plaintiff "evidenced significant attention concentration problems, consistent with his estimated IQ." *Id.* Dr. Rudd diagnosed Plaintiff with "schizophrenia, along with potential for a cognitive disorder NOS

---

[5]Plaintiff apparently suffered a closed head injury in a car accident in 1993 and reported personality changes and hallucinations after this date.

secondary to an apparent closed head injury," found that Plaintiff essentially could not read or write and assessed Plaintiff with a GAF of 50.[6]  Tr. 1035.

While Dr. Rudd's findings appear to support Plaintiff's argument that he has met the requirements of Subsection 12.05(B), "an ALJ may reject IQ scores if they are inconsistent with the rest of the record." *Johnson v. Barnhart*, 390 F.3d 1067, 1071 (8th Cir. 2004).  The Court finds that substantial evidence in the record undermines Dr. Rudd's findings.  For example, a psychological evaluation of Plaintiff one year later, in November 2003, by Dr. Steven Finlay, Ph.D., revealed that Plaintiff's low test scores on various psychological and intellectual tests were invalid due to malingering and Plaintiff's attempt to manipulate test results. Tr. 946.  Dr. Finlay assessed Plaintiff's full scale IQ to be 53, and noted that Plaintiff scored extremely low on the Wechsler Adult Intelligence Scale, the Minnesota Multiphasic Personality Inventory-2 ("MMPI 2") and the WRAT-3 tests.  However, Dr. Finlay found that Plaintiff's low test results were "considered to be invalid due to probable malingering." Tr. 947.  Dr. Finlay found Plaintiff was attempting to manipulate test results and that those test results "suggested random responding, faking bad, poor understanding of items, or confusion." Tr. 947-48.  For example, Plaintiff was able to write and spell his name correctly, but when asked to write certain letters of the alphabet, he was incorrect in 11 out of 13. In addition, after Plaintiff had responded True or False to questions that were read to him out loud during one of the tests by one of Dr. Finlay's assistants, Plaintiff stated "you know I can read these questions myself." Tr. 947.  At that point, the test administer handed Plaintiff the test booklet and

---

[6]"GAF" is a standard measurement of an individual's overall functioning level with respect only to psychological, social, and occupational functioning.  American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed.1994) DSM-IV.

asked him to read the questions out loud to verify his ability.  Plaintiff then proceeded to read two questions correctly without any errors.  After the administer left the test room for a few minutes to report the incident to Dr. Finlay, she returned  to the testing room at which point Plaintiff refused to read any further questions and averred that he could not read.  Tr. 947.  Dr. Finlay determined that his MMPI Profile was invalid and that his elevated L-Scale score "suggested an unsophisticated attempt for training oneself in a really positive light or random responding." Tr. 947.  Dr. Finlay also noted that Plaintiff's drawings on the Bender Visual-Motor Gestalt Test "are another example of trying to manipulate test results, or malingering." Tr. 948.  Dr. Finlay diagnosed Plaintiff with malingering, personality disorder NOS, sickle cell anemia and assessed a GAF of 60.  Tr. 948.

There are numerous other notations in Plaintiff's medical records indicating that Plaintiff has engaged in malingering in an attempt to gain benefits.  For example, in November 2001, physicians at the Falls County Mental Health and Mental Retardation Center found that Plaintiff did not have any depressive symptoms or hallucinations and noted that Plaintiff came to the clinic because someone had told Plaintiff that MHMR would "get my check back." Tr. 940.  Similarly, in December 2001, Plaintiff admitted to the staff of MHMR that he had visited there in the hopes of getting disability benefits and that a "psychiatrist would help him to get SSDI, Medicaid or Medicare." Tr. 939.  In January 2002, physicians at the Heart of Texas MHMR in Waco diagnosed Plaintiff with Personality Disorder NOS and malingering.  Tr. 936, 1056.  It was also noted that Plaintiff "often" abuses alcohol and drugs.  Tr. 1057.  In January and March of 2002, Plaintiff's treating physician further noted that Plaintiff was making up symptoms of hallucinations and other mental problems in order "to get more meds" and that he was "most probably Malingering." Tr. 1064-1066.

Based upon the foregoing, the Court finds that the ALJ's decision not to rely on Plaintiff's low IQ scores to find that he suffered from a listed mental impairment was based on substantial evidence. See *Clay v. Barnhart*, 417 F.3d 922, 930-31 (8th Cir. 2005) (finding that ALJ was free to disregard low IQ score where evidence showed that claimant malingered and claimant's demonstrated abilities were inconsistent with IQ score); *Johnson*, 390 F.3d at 1071 (finding that substantial evidence supported ALJ's determination that claimant failed to meet his burden of demonstrating that he met § 12.05(B) where psychological evaluations were discounted due to evidence that claimant malingered during examinations); *Sellers v. Barnhart*, 246 F. Supp.2d 1201, 1207 (M.D. Ala. 2002) (upholding ALJ's finding that claimant was not mentally retarded where low IQ scores were inconsistent with claimant's actual intellectual functioning and results were reflective of malingering).  The Court also notes that the ALJ was not bound to follow the opinion of Dr. Rudd regarding Plaintiff's IQ since it is the ALJ's role to resolve conflicts in expert's opinions.  *Clay*,  417 F.3d at 930.

However, even if Plaintiff had a "valid verbal, performance, or full scale IQ of 59 or less," as required by § 12.05(B), Plaintiff would still have to demonstrate that he meets the introductory paragraph of Listing 12.05, *i.e.*, that he has "significantly subaverage general intellectual functioning with deficits in adaptive functioning[7] initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05; *Arce v. Barnhart,* 2006 WL 1765899 at * 1 (5th Cir. June 22, 2006).  Thus, scores

---

[7]*See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(1) (stating that adaptive functions include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office").

from a test taken prior to the age of 22, or conclusions from an evaluation performed before Plaintiff had turned 22 would help to show evidence of such deficits in adaptive functioning. *Peoples v. Barnhart*, 2005 WL 1388553 at * 4 (W.D. Tex. June 08, 2005).

In the instant case, there are no records of any testing done on Plaintiff prior to age 22 and Plaintiff was never diagnosed with mental retardation. Nevertheless, Plaintiff argues that he has met the introductory paragraph of Listing 12.05 by pointing to his attendance of special education classes in school in which he received low grades and his eventual withdrawal from high school altogether. Although Plaintiff did indeed receive D's and F's in school and dropped out of school in the 10th grade, Plaintiff's school records, as the ALJ noted, do not indicate that he actually attended special education classes. *See* Tr. 918-19. Although Plaintiff now claims he left school because "he was crazy," he originally stated that he had left school in order to go to work. See Tr. 661, 1033. "[A] person leaving school after completing the ninth grade, when the reasons why are unclear, does not necessarily have deficits in adaptive functioning before age 22." *Peoples*, 2005 WL 1388553 at * 4 (holding that similar evidence of special education classes and dropping out of school was insufficient to show a deficit in adaptive functioning). As the ALJ noted, there is no evidence in the record that Plaintiff was ever diagnosed as mentally retarded or had significant deficits in adaptive functioning before age 22.

For example, a psychiatric evaluation of Plaintiff in November 1998 did not find that Plaintiff had any severe deficits in adaptive functioning or that he was mentally retarded. Dr. Aurora F. Reyes-Mignosa, M.D., a psychiatrist, noted that Plaintiff looked "[n]eat and clean in appearance," was under no acute distress and exhibited no bizarre or psychotic behavior. Tr. 662. She further noted that Plaintiff had stated that he was there in order to "get my money started back again and get

on Medicare." Tr.  661.  Plaintiff reported to Dr. Reyes-Mignosa that he had dropped out of school in the 11th grade in order to go to work, not because of mental problems.  Plaintiff also stated that he stopped working due to his sickle cell anemia, not because he was mentally retarded.  Plaintiff further reported to Dr. Reyes-Mignosa that he became depressed in 1998 while he was in jail and attempted to commit suicide.[8]  Although Plaintiff denied using alcohol, he admitted to using crack cocaine for a one-year period.  Tr. 662.  Plaintiff further reported that he stated that once he stopped using crack cocaine he stopped having hallucinations. Tr. 662.  Dr. Reyes-Mignosa noted that Plaintiff was oriented in all spheres and knew the correct date and could name the President.  Tr. 663.  His memory for both recent and remote events was reported to be intact and he was able to recite his Social Security number and birth date.  Tr. 663.  Dr. Reyes-Mignosa further noted that Plaintiff could spell the word "HOUSE" forwards and backwards and was able to do simple arithmetic.  Tr. 663.  Regarding his daily activities, Plaintiff reported that he takes care of his personal hygiene without any help and is able to cook and clean on his own.  Tr. 663.  Plaintiff further stated that he jogs twice a week, plays basketball, goes fishing, and attends church and visits friends once a week.  Tr. 663.  However, Plaintiff admitted that most of the time he watches television, sleeps and plays Nintendo. Tr. 663.  Dr. Reyes-Mignosa diagnosed Plaintiff with adjustment disorder with depression, sickle cell anemia, assessed a GAF of 40 and found that Plaintiff could manage his own benefits.  Tr. 664-65.

Plaintiff also reported in a Supplemental Questionnaire to the Commissioner in 1998 that his symptoms did not affect his ability to stand, walk, use his hands, bend, kneel, climb, hear, speak,

---

[8]However, Progress Notes from the Texas Department of Criminal Justice state that Plaintiff did not have a history of mental problems, suicide attempts or self-injurious behavior.  *See* Tr. at 1091.

travel to and from work, read the newspaper, watch TV, drive a car or use the television. Tr. 517. Such activities of daily living are inconsistent with Plaintiff's allegations of being mentally retarded.

Similarly, in March 2001, notes from the Texas Department of Criminal Justice reveal that Plaintiff was not treated for any mental problems while he was incarcerated.  Tr. 1091.  In 2002, physicians at an MHMR Center diagnosed Plaintiff with malingering and noted that Plaintiff's GAF for the past year was 60,[9] "a score reflecting 'moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR any moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers).'" *Boyd v. Apfel*, 239 F.3d 698, 700 (5th Cir. 2001) (quoting American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders).  Plaintiff's treating physician, Dr. Badhiwala also found that there was no evidence of any major mental disorder and diagnosed Plaintiff with malingering. Tr. 1057-65.  Dr. Badhiwala also noted that all of Plaintiff's symptoms of mental impairments "went away with Vistaril" Tr. 1073. *See Epps v. Harris*, 624 F.2d 1267, 1270 (5th Cir. 1980)(conditions controlled or controllable by treatment are not disabling). Evidence in the record also indicate that Plaintiff's alleged hallucinations were caused by drugs and alcohol and that such symptoms ended when Plaintiff stopped abusing alcohol and cocaine.  Tr. 1057.  See also, Tr. 51, 662.

In finding that the Plaintiff did not have a disabling mental impairment, the ALJ also relied on the medical expert's testimony in this case.  The Medical Expert, Dr. Antoinette R. Cicerelio, M..D., testified that a review of the medical records indicated that Plaintiff had no medically determinable mental impairments whatsoever. Tr. 1290.  Dr. Cicerelio noted that the only diagnoses

---

[9]Tr. 936

in the record regarding Plaintiff's mental impairments other than "malingering" was "a personality disorder not otherwise specified." *Id.*

Based upon the foregoing, the Court finds that the ALJ's finding that Plaintiff has routinely and consistently exaggerated his mental impairments in an attempt to receive disability benefits is supported by substantial evidence. While the record clearly shows that Plaintiff is of borderline intelligence, the evidence is insufficient to show that he is mentally retarded within the requirements of Listing 12.05. Plaintiff has failed to demonstrate that he has met the introductory paragraph of Listing 12.05, that he has "significantly subaverage general intellectual functioning with deficits in adaptive functioning" which were initially manifested before the age of 22. Because Plaintiff has failed to meet he introductory paragraph of Listing12.05, there is no need to address Subsection C. *See Peoples*, 2005 WL 1388553 at * 4 (noting that the claimant must meet both a subsection of §12.05 and its introductory paragraph).

**B.     Did the ALJ conduct a full and fair hearing?**

Lastly, the Plaintiff argues that he did not receive a full and fair hearing before the ALJ because (1) the ALJ did not review all of the submitted medical records, and (2) his attorney was not permitted to review all of the evidence in the record.

It is the duty of the ALJ to develop the facts relative to a claim for benefits fully and fairly. *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984); 20 C.F.R. § 410.640. "When he fails in that duty, he does not have before him sufficient facts on which to make an informed decision" and "[c]onsequently, his decision is not supported by substantial evidence." *Kane* at 1219. However, a case will only be reversed on the basis of failing to fully and fairly develop the record when the claimant shows that she was *prejudiced* as a result of the "scanty" hearing, *i.e.*, the claimant "must

show that, had the ALJ done his duty, she could and would have adduced evidence that might have altered the result." *Id.* at 1220.

Plaintiff first argues that did not receive a full and fair hearing because the ALJ did not review Plaintiff's medical records from Hillcrest Baptist Medical Center and Metroplex Hospital ("New Records")[10] which were submitted to the ALJ on December 28, 2004– more than nine months after Plaintiff's hearing took place.  Plaintiff assumes that the ALJ did not review these medical records because he did not specifically refer to those records in his opinion.  However, as the Commissioner has pointed out, the Fifth Circuit has declined to adopt the rule followed in the Third Circuit "that an ALJ must articulate specifically the evidence that supported his decision and discuss the evidence that was rejected." *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).  The Court notes that in the instant case, the ALJ expressly stated that his decision was based on "all of the evidence of record" and thus the Court can assume that the ALJ considered the New Records.  *See James J. Flanagan Stevedores, Inc. v. Gallagher*, 219 F.3d 426, 429 at n.6 (5th Cir. 2000).

Regardless, however, even if the ALJ did in fact fail to consider the New Records, Plaintiff cannot show that he was prejudiced by the ALJ's failure to do so, since the records are immaterial to Plaintiff's alleged disabilities in this case.  For example, the New Records show that Plaintiff complained of headaches in September 2004 and received a CT of the head which proved to be negative.  Tr. 1252.  These records also show that Plaintiff visited Hillcrest Baptist Medical Center on October 13, 2004, after he was hit in the head with a stick during an altercation and suffered a epidural hematoma and a "right frontal skull fracture with minimal depression." Tr. 1231-34.  After evacuating the epidural hematoma from Plaintiff, the treating physician noted that Plaintiff's

---

[10]Tr. 1231-1245.

postoperative course was "uncomplicated" and proceeded to send Plaintiff home. Tr. 1231. The last record at issue is a record from November 2004 which shows that Plaintiff was diagnosed with degenerative disk disease at C5-6 and C6-7, but that his back alignment was within normal limits. Tr. 1241. Thus, the New Records are unrelated to Plaintiff's alleged disabilities of sickle cell anemia, nerve damage to his hand, and mental impairments. Accordingly, Plaintiff could not have been prejudiced by the ALJ's alleged failure to consider such records since Plaintiff cannot show that if the ALJ had considered such records, the result of his proceeding would have been any different. *Kane*, 731 F.2d at 1220.

Lastly, Plaintiff argues that he did not receive a full and fair hearing because his attorney was not permitted to review all of the evidence in the record. Specifically, Plaintiff complains that the Commissioner did not proffer a copy of Plaintiff's prior Social Security case file (*i.e.,* Plaintiff's Second Application for Benefits) to his attorney despite his repeated requests. Plaintiff complains that the ALJ's decision denying his Second Application for Benefits[11] contained erroneous information, such as stating that Plaintiff was a high school graduate and that an examination of Plaintiff in 1988 did not show any evidence to substantiate a diagnoses of sickle cell disease. Plaintiff's counsel complains that she "was never proffered this erroneous information or any other information from the prior application" and thus Plaintiff did not receive a full and fair hearing.

Again, Plaintiff cannot show that he was prejudiced by the Commissioner's alleged failure to proffer the case file since Plaintiff's counsel did in fact obtain a copy of the case file which is part of the record of the instant appeal. *See* Plaintiff's Brief at 12. Moreover, Plaintiff could not have been prejudiced by any of the errors contained in the ALJ's previous opinion since the ALJ's opinion

---

[11]This decision was issued on May 22, 2000. *See* Tr. 48-54.

in the instant case (*i.e.*, Plaintiff's Third Application of Benefits) did not make similar factual errors in his opinion.  For example, the ALJ's eighteen-page opinion in this case correctly notes that Plaintiff is a high school drop out who has been diagnosed with sickle cell anemia.. *See* ALJ's opinion at 2 & 16; Tr. 21 & 35.   Because the ALJ did not make similar erroneous findings in the instant case, Plaintiff could not have been prejudiced by his findings.  Plaintiff cannot show that if the Commissioner had proffered his file to him that the result of the proceedings would have been any different. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("[p]rocedural perfection in administrative proceedings is not required" and a judgment should not be vacated unless the "substantial rights" of a party have been affected).  In summary, Plaintiff has failed to demonstrate that he was prejudiced in any way by the ALJ's alleged failure to develop a full and fair record in this case.   Plaintiff has failed to point to any evidence that would demonstrate that further development of the record by the ALJ would have led to a different decision in this case. Accordingly, Plaintiff's arguments are without merit.

## VII.  CONCLUSION

The Court finds that the Commissioner's decision that Plaintiff is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record and is based upon the proper legal standards.  Accordingly, the Magistrate Court **AFFIRMS** the final decision of the Commissioner and the Court will enter judgment in a separate document issued this same day.

SIGNED this the 21st day of February, 2007.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE